THELMA BELL, PERSONAL REPRESENTATIVE OF THE ESTATE OF
LINNIE EARLY, DECEASED, APPELLANT, V. WILLIAMS CARE CENTER,
INC., A NEBRASKA CORPORATION, APPELLEE.

409 N.W.2d 294

Filed July 17, 1987.    No. 85-502.

Charles I. Scudder, for appellant.

Joseph F. Bataillon of Sodoro, Daly & Sodoro, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

Plaintiff-appellant, Thelma Bell, the daughter of Linnie Early, was appointed personal representative of the estate of Linnie Early. She brought this action in Douglas County District Court against the defendant-appellee, Williams Care Center, Inc., a Nebraska corporation, doing business as Williams Care Manor, a nursing home. Plaintiff's second amended petition set out three causes of action. The first alleged that the wrongful death of decedent was caused by

(1)

negligence of defendant in its failure to properly care for the decedent, a patient in defendant's nursing home. The second cause of action prayed for damages for decedent's medical and funeral expenses, and the third cause of action sought general damages for the pain and suffering of the decedent from the time defendant's alleged improper care began on December 9, 1981, to Linnie Early's death on March 20, 1982.

The defendant's answer to plaintiff's second amended petition generally denied the allegations of the petition and affirmatively alleged that in any and all treatment rendered to decedent, defendant exercised that degree of skill and care expected of a nursing home treating patients in Omaha, Douglas County, Nebraska, or similar communities.

At the conclusion of plaintiff's evidence, the trial court sustained defendant's motion to dismiss as to plaintiff's first cause of action seeking damages for wrongful death and as to the portion of plaintiff's second cause of action seeking damages for decedent's funeral expenses. Plaintiff has not assigned any error in this ruling. The issues raised in plaintiff's third cause of action for decedent's pain and suffering and in her second cause of action for related medical damages were apparently submitted to the jury. The jury instructions are not before us, but the record shows the plaintiff had no objections to the instructions as submitted.

After jury trial, a verdict was apparently returned and judgment entered for the defendant. The verdict is not in the record before us, but a journal entry shows the overruling of plaintiff's motion for new trial. Plaintiff timely appealed. In this court plaintiff assigns two errors, which together with subparts present the following errors: (1) The trial court erred in not sustaining plaintiff's motion for a new trial because "[t]he verdict of the jury was not sustained by sufficient evidence and was contrary to the overwhelming evidence of the Appellant" and the verdict must have resulted from passion, prejudice, or mistake, or from the misconduct of defendant's counsel in "intentionally injecting the issue of race into the jury's consideration"; and (2) the trial court erred "in allowing two of Appelle's [sic] expert witnesses to render opinions on an inadequate and insufficient foundation." We affirm.

The record shows the following. In October of 1980, the decedent, Linnie Early, age 62, became a resident of the Williams Care Manor, owned by defendant. Prior to entering the nursing home, the decedent had been hospitalized and was in need of 24-hour-a-day care. Dr. Kemp, a general practitioner, was decedent's physician from approximately 1962 to the time of her death. He submitted a physician's report on decedent's condition at the time of decedent's entering defendant's nursing home. That report listed the decedent's primary diagnosis at that time as "CVA [with] left side paralysis" and secondary diagnosis as "Hypertension [and] Diabetes." Dr. Kemp testified that CVA is a "cerebral vascular accident . . . . [I]t's like a stroke . . . ." The record shows decedent's CVA occurred approximately 10 or 11 years prior to her entering defendant's nursing home.

A nurse's aide, who worked for the defendant and cared for the decedent, and decedent's husband testified that the decedent had received a cut on her left great toe during a toenail reduction by a podiatrist brought to the home by defendant on December 9, 1981. Neither of the witnesses had seen the act of cutting. The husband testified that when he visited the decedent the next day, on December 10, 1981, the decedent told him "[t]hat doctor cut my toe . . . . I cried and cried." The husband testified further that he observed a bandage on decedent's left great toe, that he saw decedent almost every day after that, and that the decedent complained of pain in her foot.

The nurse's aide testified that she did not work on December 9, 1981, but that on December 10 the decedent complained to her that the "toe doctor" had cut her toe, and she removed a white gauze bandage from decedent's toe and observed a "deep puncture-type cut" with "drainage coming from it." The aide further testified that on December 29, 1981, decedent's bandage was removed and part of the skin of decedent's toe was removed with the bandage, and that a nurse in charge, a licensed practical nurse at defendant's nursing home, had to use scissors to cut the bandage and the skin off.

Thelma Bell testified that she observed a white gauze bandage on decedent's left toe sometime between December 9 and December 25, 1981.

The podiatrist who did the toenail reduction on decedent on December 9, 1981, stated that he did not recall that the decedent's skin was broken during the procedure and that he did not remember the patient's complaining of injury, nor did he remember applying any antiseptic or bandage to the patient.

The L.P.N. in charge testified that on December 29, 1981, she was called over to observe a wound on decedent's left great toe for the first time and that she called Dr. Kemp immediately. On December 31, 1981, Dr. Kemp saw decedent. He testified that decedent's left great toe had an area of healthy, granulated tissue and looked like skin had come off but could possibly be healed. He further testified that there did not appear to be a knife cut or laceration on the toe.

On January 18, 1982, the L.P.N. reported that "[r]esident has pain in Great [left] toe - broken area healed but area between toes appears damp and tip of toe appears dark." She testified that between December 31, 1981, and January 18, 1982, the red open area of the toe had filled in and "looked really great, and we were feeling pretty good that, being that she was a diabetic . . . it's going to be okay." The decedent was seen by Dr. Kemp on January 18, 1982, at which time he noted that decedent's toe looked like there might be some early infection or gangrene setting in. Dr. Kemp admitted the decedent to Lutheran Medical Center.

On January 22, 1982, the decedent underwent an arteriogram to measure the blood flow to the decedent's legs. That test showed a 90-percent obstruction in the left, common iliac artery, indicating that the blood supply to decedent's left leg was markedly diminished. On February 1, 1982, in an attempt to improve the blood supply to decedent's leg and "in order to save what remains of her left foot," Dr. Feldhaus, a vascular surgeon, performed a femoral artery graft and bypass. This operation was not successful in improving the blood flow to decedent's leg. On February 15, 1982, Dr. Donahue, a general surgeon, amputated the gangrenous first and second toes of the decedent's left foot. Dr. Donahue testified that, at that time, there was "practically no blood at all going into the distal end of the foot." On March 8, 1982, prior to surgery scheduled for March 9, decedent suffered a heart attack.

On March 18, 1982, after decedent's heart problems stabilized, Dr. Donahue performed an above-the-knee amputation on decedent's left leg, with no complications noted. Thereafter, the decedent developed "urinary kidney shutdown" and died of "cardiac arrest" on March 20, 1982.

At the trial, Dr. Donahue and Dr. Smith, a vascular surgeon, were called as witnesses by the defendant. Each doctor testified that the cause of decedent's gangrene was a lack of blood supply to decedent's foot due to blockages in the arteries to decedent's leg. Dr. Donahue testified that a "few small breaks" he saw on decedent's toe were breaks in the skin that were mildly infected and that "there was no relationship whatsoever" between that condition and the amputation. Dr. Smith testified that, in his opinion, it was unlikely that there could have been a cut on decedent's toe on December 9, 1981, because if there had been, a "roaring" infection would have been present on December 29, and there was no such infection present.

Dr. Recker was called as a witness by the plaintiff. He testified he was an endocrinologist, a doctor who studies diseases of the glandular system and treats them, along with diabetes. Dr. Recker testified that the alleged cut on decedent's toe on December 9, 1981, and the subsequent onset of gangrene were related. His testimony was premised on the circumstantial evidence that decedent's great toe had been cut on December 9, 1981. He had no personal knowledge if such a cut had occurred.

We first consider plaintiff's assignment of error that the trial court erred in allowing two of defendant's expert witnesses to render opinions on an inadequate and insufficient foundation. Plaintiff asserts that the court erred in permitting Drs. Donahue and Smith, who were called as witnesses by defendant, to testify, when there was inadequate foundation for their qualifications as experts.

Plaintiff objected to the testimony of Dr. Donahue, stating to the trial court:

> [T]here's a lack of foundation in regard to the basis of the question.
>
> In other words, the basis is just general medical knowledge; and I object to it on the grounds that we have an endocrinologist here give testimony, and the basis there

was an examination of the complete records, and the deposition of [the nurse's aide].

Plaintiff's objection to Dr. Donahue's testimony was properly overruled, whether the objection be considered as being based on the witness' alleged lack of qualifications as an expert or upon a lack of foundation. The record shows that Dr. Donahue had been a surgeon for 32 years and during that time had performed approximately four to six amputations each year. The record further shows that Dr. Donahue was the treating surgeon and had observed Linnie Early since January of 1982.

Dr. Smith had been a general surgeon for 21 years, with a specialty in vascular surgery. Plaintiff did not object to either the qualifications of or the factual basis of the opinions stated by Dr. Smith.

The admission of opinion testimony of an expert is generally discretionary with the trial court. *Bernadt v. Suburban Air, Inc.*, 221 Neb. 537, 378 N.W.2d 852 (1985). Without specific objection to the qualifications of a witness as an expert, admission of opinion testimony of an expert is not an abuse of the trial court's discretion. See *Bernadt v. Suburban Air, Inc., supra*. There was no error in permitting Drs. Donahue and Smith to testify.

Plaintiff also contends that the verdict should be vacated and a new trial granted because the verdict was influenced by misconduct of defendant's attorney in injecting the issue of race into the jury's consideration. The background on this issue was that the decedent was black, as were the owners of the defendant's nursing home. This contention is based on defendant's counsel's question to Burdine Williams, one of the stockholders in the defendant corporation, as follows: "Q. Are most of your patients black or white? A. We have all type." Plaintiff did not object to this question, did not ask for a mistrial, and first raised this issue of attorney misconduct in her amended motion for new trial. Not only has plaintiff failed to properly preserve the question, but the record does not show, in any way, that the question was prejudicial to the plaintiff. This assignment of error is without merit.

In determining the sufficiency of the evidence to sustain a

verdict, it must be considered most favorably to the successful party and every controverted fact resolved in such party's favor, giving the benefit of inferences reasonably deducible from it. *Duncza v. Gottschalk*, 218 Neb. 879, 359 N.W.2d 813 (1984). A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party. *Vacek v. Ames*, 221 Neb. 333, 377 N.W.2d 86 (1985). The evidence before the jury was clearly sufficient to support a verdict for defendant. This assignment of error is without merit.

The judgment of the trial court is affirmed.

AFFIRMED.