COMMERCE SAVINGS SCOTTSBLUFF, INC., APPELLANT AND CROSS-APPELLEE, V. F.H. SCHAFER ELEVATOR, INC., APPELLEE AND CROSS-APPELLANT.

436 N.W.2d 151

Filed February 24, 1989.   No. 87-305.

David C. Nuttleman, of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellant.

John K. Sorensen, of Wright & Sorensen, for appellee.

HASTINGS, C.J., WHITE, and FAHRNBRUCH, JJ., and FUHRMAN and WHITEHEAD, D. JJ.

WHITE, J.

Plaintiff, Commerce Savings Scottsbluff, Inc. (Commerce Savings), appeals from a jury verdict in the district court for Scotts Bluff County in favor of the defendant-appellee, F.H. Schafer Elevator, Inc. (Schafer Elevator). We affirm.

### FACTS

This case arose from a dispute between Commerce Savings and Schafer Elevator over the right to the proceeds of crops grown by Henry and Montgomery Specht in 1985. For several years Commerce Savings financed the farming operations of Henry Specht and his son, Montgomery. In 1985, Commerce Savings made an operating loan to the Spechts in the amount of

$99,400, secured in part by a first lien on all proceeds from crops grown by the Spechts. That same year, Schafer Elevator sold fertilizer and chemicals worth $46,164.75 on an open account to the Spechts for use in the production of their crops. Schafer Elevator secured its interest by filing two fertilizer liens. The names of both Commerce Savings and Schafer Elevator were placed on checks representing the proceeds from the sale of corn grown by the Spechts in the 1985 crop season. Unable to resolve their differences regarding distribution of the proceeds, Commerce Savings filed a declaratory judgment action in the district court for Scotts Bluff County.

In the petition, Commerce Savings, citing its security agreement and financing statement covering the Spechts' 1985 crops, claimed a first lien on the proceeds of the corn crop and asked the court to determine the priorities and rights of the parties to those proceeds. In an amended answer, Schafer Elevator alleged that it had a first lien on the corn crop proceeds by virtue of its two fertilizer liens. Schafer Elevator also raised the affirmative defense of equitable estoppel. In support of this defense, Schafer Elevator claimed that Commerce Savings should be estopped from asserting the priority of its security interest because fraudulent misrepresentations of fact made by Commerce Savings to Schafer Elevator induced Schafer Elevator to extend credit to the Spechts which it would not have otherwise extended. Schafer Elevator also filed a counterclaim for fraudulent misrepresentation based on the same representations, which allegedly induced Schafer Elevator to extend credit to the Spechts.

Prior to trial, Commerce Savings made a motion for summary judgment on its petition and Schafer Elevator's counterclaim. The motion was overruled, and the case proceeded to trial.

At trial Howard Wigert, vice president of Commerce Savings, testified on behalf of the plaintiff. Jack Schafer, owner of Schafer Elevator, and his son John F. Schafer were the primary witnesses for the defendant. According to Wigert, in 1984 Commerce Savings loaned the Spechts $90,000 for farming operations on the condition that they find a fertilizer dealer who would provide fertilizer and chemicals on an open

account. The Spechts contacted Schafer Elevator, and Schafer Elevator provided the Spechts with fertilizer and chemicals for their 1984 crops. Wigert testified that Jack Schafer contacted him in 1984 prior to the planting year to discuss the Spechts' account. During that conversation, Wigert said he told Jack Schafer that Commerce Savings was going to finance a portion of the Spechts' operating expenses, but that fertilizer and chemicals were not going to be covered in the operating loan and that Schafer Elevator would have to wait until the crops were harvested before receiving any payment. He also told Jack Schafer that Commerce Savings' analysis showed that the Spechts would be able to "make it through the year," but that Schafer Elevator should protect its interest by filing a fertilizer lien, which would be junior to Commerce Savings' security interest. Wigert further testified that as the Spechts' crops were harvested and the checks for the proceeds came in, jointly payable to Commerce Savings and Schafer Elevator because of their status as lienholders, he would call Jack Schafer in to sign the checks. According to Wigert, Jack Schafer would receive a portion of those checks at that time, representing partial payment on the Spechts' account. In this manner Commerce Savings paid Schafer Elevator entirely from the proceeds of the Spechts' 1984 crop, and Schafer Elevator's account was paid in full. Based on Wigert's testimony regarding how the parties conducted business in 1984, the appellant contends Schafer Elevator knew that payment for fertilizer and chemicals was not covered by the operating loan, and payment on the Spechts' account came from the crop proceeds. In contrast, however, both Schafers testified that Wigert never told either Schafer that Commerce Savings' financing of the Spechts' operation did not include funds to pay for fertilizer and chemicals.

The financial condition of the Spechts deteriorated significantly from 1982 to 1985. In January of 1985, prior to any new operating loans made by Commerce Savings to the Spechts and before Schafer Elevator had been contacted about supplying fertilizer and chemicals for the 1985 crop, if the Spechts had been sold out and the liquidation value of the property realized, their debts would have exceeded collateral by approximately $33,000. In addition, the Spechts had serious

cash-flow problems in January of 1985. In 1984, the Spechts produced a good crop with above average yields and still lost almost $16,000.

Apparently because of the Spechts' poor financial condition coupled with the deterioration of land values and commodity prices, Commerce Savings decided to secure a Farmers Home Administration (FmHA) loan guaranty. Commerce Savings and the Spechts submitted three applications to FmHA for a loan guaranty. The first two applications were rejected by the FmHA on the grounds of negative or weak cash-flow. Before the submission of the third application, Wigert met with Richard Barta, the FmHA county supervisor, to determine what FmHA would approve and what Commerce Savings would request in the way of a loan guaranty. At that meeting, Barta told Wigert that he did not feel the Spechts' operation realistically stood a chance to succeed because it had too much debt. Nonetheless, the third application was approved because instead of guaranteeing term money, as its prior applications had requested, Commerce Savings sought only a guaranty for a 1-year operating loan. The guaranty was also approved because FmHA was to have a first lien position on all crops, which would adequately secure the guaranty, and because there was pressure within the FmHA to make this type of annual 1-year loan. Upon securing the loan guaranty from FmHA, Commerce Savings loaned the Spechts $99,400 for operational expenses for the 1985 crop-year. Even though the third application for the FmHA guaranty listed projected costs for fertilizer and chemicals for the 1985 growing year at $48,000, no part of this expense was to be financed by Commerce Savings or protected by the FmHA guaranty.

After the Spechts had signed the loan papers on April 16, 1985, they approached Schafer Elevator for the first time on April 17, 18, or 19, to discuss purchasing their fertilizer and chemical needs. As they had done in the past, the Spechts directed Schafer Elevator to discuss their financing and financial condition with Commerce Savings. John Schafer testified that the Spechts never participated directly in any discussion concerning their financial condition. According to the Schafers' testimony, Wigert was contacted twice by the

Schafers prior to any delivery of fertilizer or chemicals to the Spechts. On the day the Spechts contacted Schafer Elevator, John Schafer called Wigert to ensure that the Spechts' operating expenses would be financed. John Schafer testified that during that phone conversation, Wigert told John Schafer, in regard to Commerce Savings' financing of the Spechts' farming operations, that "we are going to finance them, in fact, we have got an [FmHA] loan guarantee for 1985 farming expenses." John Schafer went on to state that "[w]hen [Wigert] told me that I felt relatively, you know, I really had no problem with that because farming expenses, that would be the fertilizer, the chemical, the seed, whatever these people might need to produce a crop." To support John Schafer's belief that "farming expenses" included fertilizer and chemicals, he testified that fertilizer and chemicals are a large expense item in crop production and often constitute 30 to 40 percent of the total expense. At the conclusion of his discussion with Wigert on the phone, John Schafer related the conversation to his father, Jack Schafer, who then went to see Wigert in person.

However, according to Wigert, the first contact he had with anyone from Schafer Elevator in 1985 was when Jack Schafer went to Wigert's office to see him in the later part of March or first part of April, sometime prior to Commerce Savings' making the operating loan to the Spechts on April 16. Wigert testified that Jack Schafer had come to his office wanting to know the financing on the Spechts' account. Wigert stated that he told Jack Schafer that the Spechts' account would be handled in the same way Commerce Savings had handled the account in 1984 and that Commerce Savings was securing an FmHA guaranty on its operating line which required a first lien position on the crops. Wigert also stated that he asked Schafer Elevator to carry the fertilizer and chemical bill on an open account for the product year and to file a fertilizer lien to protect its interest, which would be junior to FmHA's guaranty. In response to Jack Schafer's question about whether the Spechts could make it through the year, Wigert told him that Commerce Savings' cash-flow projections indicated that there should be adequate money to pay both its operating loan and Schafer Elevator's fertilizer lien. In his testimony, Wigert

claimed he did not talk to John Schafer until after he had the above conversation with his father and that his phone call with John Schafer occurred prior to making the loan to the Spechts on April 16.

Yet, according to the Schafers' testimony, Jack Schafer went to see Wigert the next day or that afternoon after Wigert had talked to his son on the phone, which occurred after the Spechts had contacted Schafer Elevator and after the Spechts received their operating loan. Jack Schafer stated that at the meeting with Wigert, he had expressed concerns about the Spechts' financial situation. The evidence shows that the Spechts' account was the largest one Schafer Elevator carried. In response, Wigert said, " 'Jack, the [Spechts] are in better shape this year than they have been, they have made some real progress. Don't worry, everything is okay. Don't worry.' He said, 'And besides, we have an [FmHA] guaranteed loan commitment, you don't have to worry.' "

Then, according to Wigert's version of the facts, John Schafer called. Wigert stated that he told John Schafer that Commerce Savings' projections showed that there should be adequate cash-flow to pay the Spechts' account with Schafer Elevator but it would not guarantee that in writing. He went on to say that Commerce Savings had a first lien position on the crops and that it had secured an FmHA guaranty to cover the operating debt.

Despite the inconsistencies surrounding the dates when these conversations took place, the evidence is clear that the Schafers contacted Wigert twice before delivery of any product to the Spechts. Further, according to the Schafers, at no time in any of the conversations between Commerce Savings and the Schafers did Commerce Savings ever disclose that fertilizer and chemicals were not included in the operating loan for the 1985 crop expenses. Both Schafers stated that if they had known that fertilizer and chemicals were not to be included in the Spechts' operating loan, they would never have extended credit to the Spechts.

After the exchanges between Commerce Savings and Schafer Elevator, Schafer Elevator filed notices of fertilizer liens on April 19 and 22 and commenced delivery of fertilizer and

chemicals soon after. Between April 23 and August 21, 1985, Schafer Elevator delivered and supplied $46,164.75 worth of fertilizer and chemicals to the Spechts. During the trial, it was deduced that $26,047.73 represented all the charges for fertilizer and chemicals delivered and applied to the Spechts' corn crop.

In September of 1985, after the bean harvest had started, Jack Schafer called Wigert, wanting to know when the Spechts' account would be paid and if Commerce Savings had received any income from the bean crop. Wigert told Jack Schafer that the bean harvest checks had been received and that the proceeds had been used to reduce Commerce Savings' operating loan to the Spechts. He went on to tell Jack Schafer that there was trouble with the account, since the crop was going to be short and there would not be enough money to cover both Commerce Savings' operating loan and Schafer Elevator's account.

That same day, after Jack Schafer told John Schafer what Wigert had said, John Schafer had a meeting with Wigert and Barta at the FmHA office. John Schafer testified regarding what was said at the meeting:

Q. And would you tell the ladies and gentleman of the jury what happened . . . ?

A. Well, we discussed — I asked Howard [Wigert] why, how he could not include fertilizers and chemicals in this [FmHA] loan guarantee.

Q. How did you discover that the fertilizer and chemicals had not been included?

A. Mr. Barta told me.

Q. Did you know before Mr. Barta told you that, did you have any idea that the fertilizer and chemicals had not been included in the loan guarantee?

A. No, sir. Like I said, if I had known we wouldn't be here today.

. . . .

Q. What happened, what was the discussion?

A. I was crushed, that was the first I knew, you know, here's $46,000 of my dad's retirement, it's my life, I was crushed. I do remember asking Mr. Wigert, you know, "How could you do this?" I mean, fertilizer and chemical,

you can't grow a crop without fertilizer and chemical or seed. You can grow crop hanging in the air, you don't even need the dirt, how can you not put that stuff into the operating budget and when you had told us you had.

Q. And was there any reply or did Mr. - - -

A. What could he say.

Q. Did he give you an answer?

A. No, what could he say.

Schafer Elevator was never paid anything on the $46,164.73 Specht account, and after the 1985 harvest, the Spechts declared bankruptcy. The proceeds of the bean crop used by Commerce Savings to reduce its operating loan reduced the initial $99,400 balance down to $52,000. Commerce Savings sold the Spechts' corn crop for $51,000, for which it received payment in the form of three checks which, in addition to having Henry Specht's and Commerce Savings' names on them, also had Schafer Elevator's name on them. By stipulation, the proceeds from the corn crop were deposited into an account at the First State Bank of Scottsbluff pending outcome of the suit.

At the close of all the evidence, Commerce Savings made three motions for a directed verdict. Commerce Savings first moved the court for a directed verdict on the issue of priority on its lien. The trial court sustained the motion, noting that "[o]n priority, I'm of the opinion that absent estoppel or fraud that you are entitled to priority and I intend to so instruct. So that's in effect sustained." Commerce Savings next moved for directed verdicts on the issues of equitable estoppel and Schafer Elevator's counterclaim for fraudulent misrepresentation, which motions were both overruled. The court instructed the jury that if it found for the defendant on the claim of equitable estoppel, it was limited to awarding only $26,047.73, which represented the amount of Schafer Elevator's lien on the corn proceeds, and the balance of the award would have to come from the fraud claim. The jury found for the defendant, Schafer Elevator, and returned a verdict of $26,047.73 on the claim of equitable estoppel and a verdict of $20,117.02 on the counterclaim. Commerce Savings moved for a judgment notwithstanding the verdict or, in the alternative, for a new

trial, which was overruled.

Commerce Savings appeals, assigning seven errors. Appellant claims the district court erred in (1) overruling appellant's motion for summary judgment prior to trial; (2) overruling appellant's motion for a directed verdict at the close of the evidence on the issue of equitable estoppel; (3) overruling appellant's motion for a directed verdict at the close of the evidence on the issue of the appellee's counterclaim for fraudulent misrepresentation; (4) giving jury instruction No. 2, an instruction on the equitable estoppel defense and fraudulent misrepresentation; (5) finding sufficient evidence adduced at trial on the issue of equitable estoppel; (6) finding sufficient evidence adduced at trial on the issue of the appellee's counterclaim for fraudulent misrepresentation; and (7) overruling appellant's motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial.

## SUMMARY JUDGMENT

With regard to appellant's first assignment of error relating to the district court's overruling of its motion for summary judgment prior to trial, this court has repeatedly held that the denial of a motion for summary judgment is not a final order and therefore is not appealable. *Gruenewald v. Waara*, 229 Neb. 619, 428 N.W.2d 210 (1988). Furthermore, we note that any errors occurring at this stage in the proceeding were either remedied by the trial or preserved by the appellant's other assignments of error to be addressed below.

## DIRECTED VERDICT

Appellant's second and third assignments of error concern the overruling of Commerce Savings' motions for a directed verdict on the issues of equitable estoppel and Schafer Elevator's counterclaim for fraudulent misrepresentation. It is a well-settled rule in this jurisdiction that

> [w]ith regard to the overruling of a motion for a directed verdict made at the close of all the evidence, our review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can only draw but one conclusion from the evidence, where an issue should be decided as a matter of law.

*Kearney State Bank & Trust v. Scheer-Williams*, 229 Neb. 705,

708, 428 N.W.2d 888, 891 (1988).

"In reviewing a directed verdict, the party against whom a motion for a direction of liability is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. . . ."

*Raben v. Dittenber*, 230 Neb. 822, 824, 434 N.W.2d 11, 13 (1989). Having set out the standard of review applicable to Commerce Savings' second and third assignments of error, we now examine each issue separately.

## EQUITABLE ESTOPPEL

In the first of two arguments in support of its second assignment of error, Commerce Savings attacks the applicability of equitable estoppel under the facts of this case. Commerce Savings, citing 28 Am. Jur. 2d *Estoppel and Waiver* §§ 32 and 33 (1966), claims that the purpose of raising the defense of equitable estoppel is to defeat a right or claim a party would otherwise have. Further, equitable estoppel does not create a new right or give a cause of action; rather, it serves to protect rights already acquired. Commerce Savings contends that the fertilizer liens are invalid under Neb. Rev. Stat. § 52-1103 (Reissue 1988) and that since the liens are not valid, Schafer Elevator cannot

in this case claim a lien upon the proceeds of the corn crop if they do not otherwise have a valid fertilizer lien by virtue of alleging equitable estoppel regardless of whether there may be facts supporting said legal theory. To do so would allow equitable estoppel to create a right in the proceeds of the 1985 corn crop, which F.H. Schafer did not otherwise have.

Brief for appellant at 20.

Section 52-1103 states:

In order to be valid against subsequent lienholders, any lien under section 52-1101 [in this case any supplier of fertilizer and chemicals] shall be filed within sixty days of the last date upon which the product, machinery, or

equipment was furnished, or work or labor was performed under the contract, but in no event shall it have priority over prior lienholders unless prior lienholders have agreed to the contract in writing. Such lien shall attach as of the date of filing and may be foreclosed in the manner and form provided for the foreclosure of secured transactions as provided in Article 9, Uniform Commercial Code.

Commerce Savings makes the assertion that Schafer Elevator's fertilizer liens are not valid under § 52-1103 because the evidence showed that the last delivery of fertilizer by Schafer Elevator was August 21 and that the appellee had filed its notices of fertilizer liens in April, more than 60 days prior to the date of last delivery. In support of its interpretation of § 52-1103, the appellant cites *Circle 76 Fertilizer v. Nelsen*, 219 Neb. 661, 365 N.W.2d 460 (1985).

While noting that there is authority in this jurisdiction for appellant's argument that estoppel may be urged for the protection of a right, but it can never create a right, see *Warren v. Papillion School Dist. No. 27*, 199 Neb. 410, 259 N.W.2d 281 (1977), we find that appellee's liens were valid fertilizer liens under Neb. Rev. Stat. ch. 52, art. 11 (Reissues 1984 & 1988), relating to fertilizer and agricultural chemical liens. Commerce Savings' reliance on *Circle 76* is misplaced. The central issue of *Circle 76* was whether the elements of estoppel were sufficiently proved. The validity of the fertilizer lien under § 52-1103 was not at issue, and, therefore, any comment by the court relating to the validity of fertilizer liens under § 52-1103 was dictum. A case is not authority for any point not necessary to be passed on to decide the case or not specifically raised as an issue addressed by the court. *Yoder v. Nu-Enamel Corporation*, 140 Neb. 585, 300 N.W. 840 (1941).

The general rules governing statutory construction and interpretation provide that

"[i]n the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning; this court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous." . . . Furthermore, "it is not

within the province of this court to read a meaning into a statute which is not warranted by the legislative language; neither is it within the province of this court to read anything plain, direct, and unambiguous out of a statute."

. . .

. . . "In construing a statute it is presumed that the Legislature intended a sensible rather than an absurd result."

*Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 229 Neb. 837, 841-42, 429 N.W.2d 359, 362 (1988).

An analysis of chapter 52, article 11, indicates that the Legislature created § 52-1101 (Reissue 1988) to define the validity of fertilizer liens such as the ones Schafer Elevator had and that § 52-1103 (Reissue 1988) was designed to establish the priority of these liens. Section 52-1101 provides:

A person, including a firm or corporation, who shall contract or agree with another (1) to furnish any fertilizer, soil conditioner, or agricultural chemical, (2) to furnish machinery and equipment for the application of such products, or (3) to perform work or labor in the application of such products *shall have a lien* for the agreed charges, or in the absence of an agreement, for the reasonable charges and costs of satisfying such lien, *upon the crops produced within one year upon the land where such product was applied*, the machinery or equipment for application was used, or the work or labor of application was performed, and upon the *proceeds from the sale of the crops.*

(Emphasis supplied.) According to § 52-1101, a lien on the crops and proceeds from those crops, under this article, is established at the same time product, machinery, or labor is supplied. Section 52-1103 sets out the priority of that lien by providing that if the lien is to be *valid against subsequent lienholders*, it must be filed within 60 days of the last date the product, machinery, or labor is supplied. A lien not filed within 60 days of the last delivery is still a valid lien on crops produced within 1 year of the date the product was supplied and on the proceeds for the sale of such crops; the lien simply is not valid as to subsequent lienholders. As appellee notes in its brief,

"Nowhere in Article XI of Chapter 52, the Fertilizer Lien Law, is it stated that a lien filed more than 60 days before the last delivery of product is made is invalid." Brief for appellee at 28. Under the appellant's construction of § 52-1103, any supplier, such as Schafer Elevator, which knew it was to be providing products from April until the end of August would have to wait until the end of June before it could file a lien to protect itself. We do not think the Legislature intended a supplier like Schafer Elevator to be required to maintain an unsecured position, possibly for several months in a case like the one at bar, on products supplied until 60 days prior to the last delivery of product. Therefore, this court holds that under § 52-1101, a valid lien is created at the time products, labor, or machinery is supplied and that § 52-1103 merely establishes the priority of that lien. A lien must be filed within 60 days of the last delivery, or that lien, though still a valid lien on crops produced within 1 year of the date the product was supplied and on the proceeds for the sale of such crops, will not have priority over subsequent lienholders.

Commerce Savings' second argument attacks the sufficiency of the evidence on the elements of equitable estoppel. In *O'Neill Prod. Credit Assn. v. Mellor*, 220 Neb. 555, 371 N.W.2d 265 (1985), we set out the elements of equitable estoppel. To succeed on a defense of equitable estoppel, Schafer Elevator must establish the coexistence of two sets of elements. Schafer Elevator must first prove that Commerce Savings, as the party to be estopped, (1) engaged in conduct which amounted to a false representation or concealment of material facts, or, at least, which was calculated to convey the impression that the facts were otherwise than, and inconsistent with, those which Commerce Savings attempted to assert; (2) had the intention, or at least the expectation, that such conduct would be acted upon by, or influence, Schafer Elevator; and (3) had knowledge, actual or constructive, of the real facts. The evidence must also show that, at the same time, Schafer Elevator (4) had a lack of knowledge and of the means of acquiring knowledge of the truth of the facts in question; (5) relied, in good faith, upon the conduct or statements of Commerce Savings; and (6) acted or refrained from acting

because of Commerce Savings' conduct such as to change its position or status to its injury, detriment, or prejudice. Moreover, these elements must be established by clear and convincing evidence. *Circle 76 Fertilizer v. Nelsen*, 219 Neb. 661, 365 N.W.2d 460 (1985). Resolving every controverted fact in Schafer Elevator's favor and giving it the benefit of every inference which can be reasonably drawn therefrom, *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989), an examination of the record indicates that there was sufficient evidence to establish each element of equitable estoppel by clear and convincing evidence. Since Commerce Savings, in support of its assignment of error, only contests the sufficiency of the evidence with regard to the fourth and fifth elements of equitable estoppel and thereby concedes the sufficiency of the evidence regarding the other elements, we limit our analysis only to the fourth and fifth elements of equitable estoppel.

Commerce Savings contends that there is not enough evidence to satisfy the fourth element because Schafer Elevator failed to prove that it did not know and could not have found out that the operating loan made by Commerce Savings did not cover the fertilizer and chemical account. Appellant states in its brief:

Schafer Elevator knew that in the prior year of 1984, payments to them were made from the proceeds of the crop and not from any loan account of Commerce Savings. . . . [T]hat F.H. Schafer Elevator had knowledge that payments were to be made in 1985 the same as they were in prior years. . . . Schafer Elevator, Inc. filed a fertilizer lien in 1984 and 1985 because they knew the account would not be paid until the crop proceeds were available. [The Schafers] had the means of knowledge of the truth of the facts in question in that they had the access to the same information as Commerce Savings regarding Commerce Savings' loan to Mr. Specht in that they could have inquired of Mr. Specht as to the amount of his loan and the items covered by the operating loan or they could have inquired of Farmers Home Administration, who had guaranteed the loan in 1985 as to the conditions of the loan nor did they inquire of [Commerce Savings] as to what

portions of the operations were covered by the loan. Brief for appellant at 26.

However, utilizing the standard of review detailed above, the evidence established that though the Schafers contacted Wigert twice prior to the extension of any credit to the Spechts in 1985, they never knew that the operating loans extended to the Spechts in 1984 and 1985 by Commerce Savings did not cover the fertilizer and chemicals purchased on account. Further, the Schafers testified that if they had known fertilizer and chemicals were not included in the Spechts' operating account, they never would have extended credit to the Spechts. A reasonable inference can be drawn from the evidence that when Wigert told John Schafer that Commerce Savings was going to finance the Spechts' farming expenses and that these expenses were going to be guaranteed by the FmHA, John Schafer believed fertilizer and chemicals were included in those expenses. The same inference can be drawn when, in response to Jack Schafer's expressed concern on whether the Spechts could make it through the year, Wigert told Jack Schafer not to worry, that "the [Spechts] are in better shape than they have been" and that "*we* have an [FmHA] guaranteed loan commitment . . . ." (Emphasis supplied.) Evidence was also introduced to show that Schafer Elevator filed fertilizer liens as a general business practice and not in response to Commerce Savings' assertion that the Schafers knew that fertilizer and chemicals were not included in the Spechts' operational loan. In addition, the Spechts never discussed their financial matters with Schafer Elevator, but always referred Schafer Elevator to Commerce Savings regarding matters concerning their financing with the appellant.

The rule, long held in this jurisdiction, is that no estoppel can arise where all the parties interested have equal knowledge of the facts, or where the party claiming estoppel has the same means of ascertaining or is chargeable with notice of the facts. *Watkins v. Dodson*, 159 Neb. 745, 68 N.W.2d 508 (1955); *Scottsbluff Nat. Bank v. Blue J Feeds, Inc.*, 156 Neb. 65, 54 N.W.2d 392 (1952). The converse of this rule is that estoppel will lie where the party asserting estoppel does not have the same knowledge of the facts that the party being estopped has, and

does not have the ability to ascertain or is not chargeable with notice of those facts. From the record, it is clear that documents setting forth the coverage of Commerce Savings' operating loan and the FmHA guaranty were internal financial documents not available to the public. Though the record is unclear as to whether Schafer Elevator could have had access to those records had the Schafers requested such access, we hold that the statements attributed to Wigert in this case are legally sufficient to support a finding that Schafer Elevator relied on the facts as related to it and that it was entitled to do so. Accordingly, we hold that there was sufficient evidence to establish the fourth element of equitable estoppel.

Commerce Savings also contends that there was not sufficient evidence to prove the fifth element of equitable estoppel, that of good-faith reliance by Schafer Elevator upon the conduct or statements of Commerce Savings. Apparently, the appellant argues that Schafer Elevator was on notice by the prior conduct of Commerce Savings in 1984 that the Spechts' account was being paid from proceeds of crops and not by an operating loan. Therefore, Schafer Elevator should not be permitted to assert estoppel, since it did not rely in good faith on Commerce Savings' actions. That contention, however, cannot stand, as the evidence establishes that the Schafers never knew the operating loans extended to the Spechts in 1984 and 1985 by Commerce Savings did not cover the fertilizer and chemicals purchased on account, especially since Commerce Savings had clearly represented in conversations with the Schafers that the 1985 farming expenses were going to be financed and protected by an FmHA loan guaranty. Therefore, there is clear and convincing evidence of the fifth element of equitable estoppel.

Accordingly, appellant's second assignment of error is without merit.

## MISREPRESENTATION

In order to show misrepresentation, the party alleging it must plead and prove the following elements: (1) that a representation was made; (2) that the representation was false; (3) that the representation was known to be false when made, or was made recklessly without knowledge of

its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely on it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result.

*Pawnee County Bank v. Droge*, 226 Neb. 314, 322-23, 411 N.W.2d 324, 330 (1987).

Commerce Savings challenges the sufficiency of the evidence with regard to only one element of fraudulent misrepresentation, thereby conceding the sufficiency of the evidence establishing the other elements. Commerce Savings contends the evidence was insufficient to show that the representation made was false. The appellant argues the evidence demonstrated that the operating loan it was making to the Spechts did not cover fertilizer and chemicals and that it never made any representations to the contrary. Additionally, the appellant asserts that the Schafers assumed from the statements made by Wigert that the operating loan would cover those expenses. However, resolving every controverted fact in Schafer Elevator's favor and giving it the benefit of every inference which can be reasonably drawn, *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989), the representation by Wigert to the Schafers was that the 1985 farming expenses, without qualification, were to be financed and guaranteed. The evidence is sufficient to support a finding that the Schafers believed farming expenses included fertilizer and chemicals. The representation was definitely false, and the Schafers relied on it to their detriment. "A person is justified in relying upon a representation made to him as a positive statement of fact, when an investigation would be required to ascertain its falsity." *Forker Solar, Inc. v. Knoblauch*, 224 Neb. 143, 154, 396 N.W.2d 273, 281 (1986).

Therefore, Commerce Savings' third assignment of error is also without merit.

## SUFFICIENCY OF THE EVIDENCE

Appellant's next three assignments of error, the giving of jury instruction No. 2 (an instruction on equitable estoppel defense and fraudulent misrepresentation) and insufficient evidence adduced at trial both to sustain appellee's burden of proof on the issue of equitable estoppel and to sustain appellee's burden

of proof on the issue of appellee's counterclaim for fraudulent misrepresentation, all concern the issue of sufficiency of the evidence. As set out above, we find that there was sufficient evidence to establish that Schafer Elevator met its burden of proof on the issues of equitable estoppel and fraudulent misrepresentation, and, therefore, the jury instruction on these claims was properly given. " 'In our judicial system, it is entirely within the province of the jury to weigh the evidence and resolve the resulting conflicts.' " *Raben v. Dittenber, supra* at 831, 434 N.W.2d at 17. A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is any evidence presented to the jury upon which it could find for the successful party. *Bell v. Williams Care Center*, 226 Neb. 1, 409 N.W.2d 294 (1987). The evidence before the judge and jury was clearly sufficient to support the instruction given and to support a verdict for the appellee on the issues of equitable estoppel and fraudulent misrepresentation.

## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL

Appellant's last assignment of error, the overruling of its motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial, is also without merit.

"The standard of review of an order granting a new trial is whether the trial court abused its discretion. . . . A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party. Unless such error appears, a party who has sustained the burden and expense of trial, and who has succeeded in securing a verdict on the facts in issue, has a right to keep the benefit of that verdict."

*Mundt v. Northwestern Bell Tel. Co.*, 230 Neb. 192, 195, 430 N.W.2d 530, 532 (1988).

"On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. . . . A jury verdict will

not be disturbed unless it is clearly wrong. . . ." (Citation omitted.) *Carnes v. Weesner,* 229 Neb. 641, 645, 428 N.W.2d 493, 496 (1988). As detailed above, the verdict in this case was not clearly wrong, and a review of the record reveals no abuse of discretion on the part of the trial court.

Because of the relief granted Schafer Elevator, it is not necessary to discuss the cross-appeal filed herein. Accordingly, the decision of the district court is affirmed.

AFFIRMED.