DONALD P. SHOEMAKER AND LYNDA J. SHOEMAKER, APPELLEES
AND CROSS-APPELLANTS, V. DOROTHY C. HEAD AND JOHN F.
HEAD, APPELLANTS AND CROSS-APPELLEES.

510 N.W.2d 408

Filed May 11, 1993.   No. A-91-197.

Eugene P. Welch and Cynthia E. Epstein, of Gross & Welch, P.C., for appellants.

Steven J. Olson, of Liakos & Olson, for appellees.

MILLER-LERMAN, and WRIGHT, Judges, and NORTON, District Judge, Retired.

NORTON, District Judge, Retired.

This is an appeal from the district court for Douglas County, Nebraska, and from jury verdicts in favor of the plaintiffs, Donald P. Shoemaker and Lynda J. Shoemaker (Shoemakers), involving a contract dispute with the defendants, Dorothy C. Head and John F. Head (Heads). The Shoemakers brought the original action to collect the final payment on the sale of their art gallery, together with two other causes of action. The Heads had refused to pay the final payment, claiming that the

Shoemakers had misrepresented the value of the inventory purchased. The jury returned verdicts for the total amount claimed due on all three causes, with 14-percent interest on the first cause. The Heads assign four errors: (1) The jury erred in finding in favor of the Shoemakers and against the Heads on the question of whether the Shoemakers misrepresented the value of the gallery's inventory, (2) the verdict is not sustained by sufficient evidence, (3) the evidence shows as a matter of law that the Shoemakers' representation of the inventory at $180,000 was a misrepresentation, and (4) the Heads are entitled to a reversal of the jury verdicts and to a remittitur of the difference between the represented value and the cost of the inventory or, in the alternative, to a remand of the cause for retrial to determine the damages in accordance with the evidence. We affirm.

The evidence discloses that on March 31, 1989, the Shoemakers, as sellers, entered into an "Agreement of Purchase and Sale" for the American Indian Store Plains Gallery and Plains Gallery II, with the Heads as buyers. The American Indian Store Plains Gallery was generally known and referred to by the parties as the Dodge Street store, and the Plains Gallery II as the airport store. The stated purchase price was $180,000. In accord with the terms of the contract, $100,000 was to be paid at the time of closing, and, in addition, the Heads were to execute and deliver to the Shoemakers on closing a promissory note in the amount of $80,000, together with a security agreement in favor of the Shoemakers. By the terms of the promissory note, there were to be two payments of $40,000 each. The initial payment was made, the note delivered, and the Heads took possession of the business. The first installment on the note came due and was paid on July 31, 1989. The final installment came due on December 29, 1989, and was not paid.

Under the purchase agreement, the price "for all Assets to be acquired by Buyer from Seller is the sum of Twenty-Six Thousand Dollars ($26,000) plus the cost of all approved goods held for resale which are acquired by Buyer hereunder as described in this Article I." The pertinent portions of the agreement for our purposes in reviewing this matter are as

follows:

## II. <u>PROPERTY TO BE TRANSFERRED</u>

A. . . .

1. . . . [E]quipment, machinery, office furniture, office equipment, fixtures, leasehold improvements, supplies, consumables, display cases, racks, shelving, counters, registers, office machines, and any and all other tangible personalty or improvements used by Sellers to conduct and operate the Business, all of which shall be allocated a value of Fifteen Thousand Dollars ($15,000) . . . .

2. All approved goods held for resale which shall be valued at Sellers' cost as defined herein. Approved goods held for resale shall be determined by a physical inventory of all items held for sale to customers in the ordinary course of business as of the closing date. . . .

3. Sellers' agreement not to compete . . . and Sellers' agreement to continue to provide consulting and other services . . . shall be valued at the sum of Ten Thousand Dollars ($10,000).

4. The right to the use and the benefit of the name "American Indian Store Plains Gallery" . . . which shall be assigned the value of One Thousand Dollars ($1,000).

. . . .

## IV. <u>INSPECTION</u>

A. Buyer shall have until March 30, 1989 to inspect the Assets to be acquired hereunder, to inspect and review income and expense records of Seller, and to determine, in Buyer's sole discretion, whether to proceed with the transaction contemplated herein. Such period of time is hereinafter referred to as the "inspection period." . . .

. . . .

## XVI. <u>MISCELLANEOUS</u>

. . . .

C. This Agreement supersedes all prior negotiations or agreements between the parties hereto pertaining to the subject matter hereof and contains the entire understanding of the parties. No representations, warranties, covenants or statements not contained or incorporated by reference herein have been made by either

of the parties hereto and both parties acknowledge they are not relying upon any such representations, warranties, covenants or statements. This contract may not be altered, amended, modified, revised or changed except in writing executed by both parties hereto, including any alteration, amendment, modification, revision or change in this Part C.

By way of further background, the evidence shows that the execution of the agreement, with addendums or amendments thereto, was the culmination of several weeks of verbal negotiations. The agreement itself was prepared by an attorney representing the Heads. The addendums or amendments were apparently prepared by or at the direction of the Heads. All papers were executed at the same time.

At trial, Lynda Shoemaker testified that the sale price of $180,000 was based on wholesale inventory value, tools, materials, and other physical plant equipment and that it was an inventory and equipment sale. Dorothy Head claimed that Lynda Shoemaker had stated the adjusted sellers' inventory alone at a value of $180,000. This was denied by Lynda Shoemaker, who said, "No, I—I never made that statement because that would have meant that our inventory was valued at something like $215,000, and there just wasn't that inventory in the store." Later, Dorothy Head acknowledged that she did not want to pay more than $180,000 total for the business, and she entered into the addendum or amendment to the agreement limiting the sellers' cost of inventory to $155,000 "because it was the difference between the allocation of the other items and the [$]180,000." However, she continued to maintain that she expected the inventory value to be "$180,000 after [Lynda Shoemaker] had adjusted for the—for the costs of the old merchandise."

The evidence reflects that the retail inventory value at the airport store was figured at $77,676.23, and the retail inventory at the Dodge Street store was figured at $279,930.36. The contract was silent on how to value sellers' cost, and the measure of sellers' cost is disputed in this case. The parties express conflicting views of the correct measure of sellers' cost.

The evidence establishes that Dorothy Head first understood

that the retail price of merchandise was an automatic 50 percent above sellers' cost. Therefore, she testified that sellers' cost was to be figured by taking the retail value of the inventory at both stores and then subtracting 50 percent from the retail, with a further reduction of 20 percent for "shopworn" merchandise. As noted above, the contract provided to the Heads a right of inspection to reconcile the invoices prepared by Lynda Shoemaker with the physical objects before closing the transaction. The Heads did not take advantage of this opportunity, but now allege that the Shoemakers misrepresented the correct cost of the inventory. Dorothy Head asserts that she trusted Lynda Shoemaker's statement that the inventory was worth $180,000 after adjustments.

Three months after closing, the Heads began matching invoices to merchandise. During the course of this project, which took several months, Dorothy Head compared actual invoice costs to the figures Lynda Shoemaker had used to calculate the sellers' value, namely 50 percent of the retail prices listed on the invoice sheets. She discovered during the course of this examination that some of the merchandise had been purchased for less than 50 percent of retail price. The Heads eventually determined by this method that the actual cost of the inventory was between $153,000 and $155,000 wholesale, before any adjustment for shopworn merchandise. Dorothy Head testified that after taking a 20-percent adjustment of the gross wholesale cost for both stores, the total inventory cost was $124,292.83. She further testified that Lynda Shoemaker "told us 20% in—in the various discussions that we had had. The 15% came up in her deposition. It's 20% also on the inventory sheet on the airport store that's attached to the purchase agreement." The Heads contend that there was supposed to be a 20-percent reduction on both stores. However, Lynda Shoemaker did not note a 20-percent reduction on the Dodge Street store inventory sheet on schedule A-2 to the agreement, whereas the 20-percent figure is included in the airport store inventory sheet. Thus, the Heads assert that the Shoemakers shorted them the difference between $180,000 and $124,292.83, or $55,707.17.

Lynda Shoemaker testified that the sellers' cost of inventory

(wholesale) was to be approximately $155,000, and according to her calculations, that was the wholesale inventory. She arrived at this figure by taking the inventory from store inventory sheets listing items at retail cost. A retail price of $77,676.23 was the total of her figures at the airport store, and she then took a 50-percent discount of that figure, with a further 20-percent discount "to allow for the discrepancy in the prices and—and the way the merchandise was purchased." She performed the same procedure at the Dodge Street store, where the wholesale price before adjustment totaled $146,873.25. However, at that store she took only a 15-percent adjustment discount from the wholesale cost because "the merchandise there is different from the merchandise at the . . . airport store." Finally, she arrived at $124,842 for the Dodge Street store and $31,000 for the airport store, or a total of $155,842 in merchandise.

From the foregoing, it is obvious that there are two differences between the methods of valuation used by the parties in reaching their conclusions. First, the Shoemakers used the retail value of each item in the inventory and then divided that number in half. The Heads went item by item and in the process discovered that some items had been purchased for less than 50 percent of retail. On those items, the Heads used the purchase price rather than one-half of the retail price. Second, each party used a different percentage for the further discount to cover shopworn, or unsalable, merchandise. The Shoemakers used 15 percent at the Dodge Street store and 20 percent at the airport store, while the Heads subtracted 20 percent from the adjusted inventory at both stores.

The two methods of valuation produce quite different measures of the sellers' cost of merchandise. However, the main difference between the parties is that the Shoemakers claim that the value of the entire contract was to be $180,000, while the Heads allege that it was represented to them that for the total price, they would receive $180,000 of inventory at the adjusted sellers' cost, together with the equipment, a noncompete agreement, and use of the name, valued separately at $26,000.

In reviewing a jury verdict, we are mindful of the rule that such a verdict may not be set aside unless it is clearly wrong, and

it is sufficient if there is any competent evidence presented to the jury upon which it could find for the successful party. See *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989). See, also, *Bay v. House*, 226 Neb. 521, 412 N.W.2d 466 (1987).

In the oral argument on appeal, the issue of whether there was an ambiguity in the sellers' valuation was discussed. When we search the bill of exceptions, we cannot ascertain as a matter of fact that this issue was raised and ruled upon as an issue in the case in chief, or raised merely in the context of the alleged claim of misrepresentation. Comments of the trial court and portions of the evidence permitted might indicate that this became an issue separate from the counterclaim. If it was not raised as an issue in the trial court, it is not proper for us to review the matter in this court; but because of the uncertainty of the record, we will address the question with a general discussion.

The agreement between the parties mentioned only that the inventory was to be "valued at Sellers' cost as defined herein." There is, however, no definition of "sellers' cost" contained within the document itself and therefore that issue would have to be determined by the intent of the parties, as gleaned from their actions and all facts and circumstances surrounding the agreement. See, *Oehlrich v. Gateway Realty of Columbus, Inc.*, 209 Neb. 417, 308 N.W.2d 327 (1981); *Kinkenon v. Hue*, 207 Neb. 698, 301 N.W.2d 77 (1981); *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990); *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988). That determination of intent would be made by a jury. See *Bando v. Cole*, 197 Neb. 722, 250 N.W.2d 651 (1977).

In determining the intent of the parties, the jury could have considered instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction. Legally, these are all one instrument and are to be construed together as if they were as much one in form as they are in substance. See *Bando v. Cole, supra*.

Consistent with the execution of the agreement, a promissory note was executed and delivered to the Shoemakers. The note was for $80,000, bringing the total purchase price to $180,000. If we were to construe these two together, we would

find that the sellers' cost of inventory was the difference between the entire purchase price and the $26,000 allocated for other items. Additionally, we find the sellers' valuation in schedule A-2, which is attached to the agreement as a part thereof. In this document, the Shoemakers disclose the retail list price of the inventory, divide it in half, and deduct 20 percent from the airport store wholesale inventory and 15 percent from the Dodge Street store wholesale inventory.

Therefore, if this issue was considered by the jury under item 3 of instruction No. 7, and the jury determined the sellers' cost to be as asserted by the Shoemakers, we could not say that the jury would have been clearly wrong in adopting this version over that advocated by the Heads, i.e., actual cost minus a flat 20-percent discount at each store.

Moving to the issue of misrepresentation, we consider the elements that must be pled and proven by the party alleging this defense: (1) that a representation was made; (2) that the representation was false; (3) that the representation was known to be false when made, or was made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely; and (6) that the plaintiff suffered damages as a result. See *Commerce Sav. Scottsbluff v. F.H. Schafer Elev., supra.*

Taking the evidence in the light most favorable to the Shoemakers, which we are bound to do, we must determine whether there is any competent evidence upon which the jury could decide that the Shoemakers did not misrepresent the value of their inventory to the Heads. See, *Youngs v. Potter,* 237 Neb. 583, 467 N.W.2d 49 (1991); *Auer v. Burlington Northern RR. Co.,* 229 Neb. 504, 428 N.W.2d 152 (1988).

The Heads have alleged that the Shoemakers represented the value of their adjusted sellers' cost inventory at $180,000, so our first consideration must be to examine the record for evidence of the promised value of an adjusted sellers' inventory. The agreement is silent as to the expected amount of inventory to be transferred at sellers' cost. The evidence of this comes from testimony about verbal representations and conversations made or held prior to the signing of the agreement and prior to

the implementation of article XVI(C) of the purchase agreement, as set forth previously.

Using the standard articulated above, we find that schedule A-2, previously mentioned, plainly outlines both the retail and wholesale costs of the inventory, and an examination of the figures disclosed therein shows that there was not a $180,000 postadjustment sellers' cost represented on paper. In addition, Lynda Shoemaker directly challenged Dorothy Head's assertion and denies having told her that the adjusted cost of the inventory would be $180,000. Finally, it was the Heads who limited the total price of the sale to $180,000, in the addendum amendment which they prepared and required as a condition to the completion of the sale. A jury could reasonably infer that the Heads expected to receive a total value of $180,000 in the business, in exchange for their payment.

There is, therefore, competent evidence in the record for the jury to determine that the Shoemakers did not tell the Heads that the postadjustment cost of the inventory would be $180,000, and we so find. Because the jury could properly find that no representation was made, the claim of misrepresentation must fail, and the jury was not clearly wrong in denying the claim asserted by the Heads.

On the cross-appeal, we hold that the district court did not abuse its discretion when it failed to award the Shoemakers prejudgment interest. There was a legitimate controversy over the computation of the value of the inventory, and therefore, a controversy concerning the amount of payment due to the Shoemakers. It was within the court's discretion not to award interest when failure to timely pay the note was the result of a legitimate controversy, and we do not find that court's decision was an abuse of that discretion.

In view of our decision, it is not necessary to address the additional assignments of error.

AFFIRMED.