serious crime victims who do not have the attachment remedy. Similarly, there is no substantial difference between the public employees subject to the remedy and those who commit many other serious crimes yet retain their privilege from attachment. Accordingly, the Legislature's preferential treatment of the favored groups and exclusion of others that are similar in circumstance runs afoul of the Constitution's prohibition against special legislation.

Affirmed.

Wright and Cassel, JJ., not participating.

————————

Sam Christiansen, an individual, appellee and cross-appellant, v. County of Douglas, a political subdivision of the State of Nebraska, et al., appellants and cross-appellees.

Rich McShane, on behalf of himself and all similarly situated persons, appellee and cross-appellant, v. County of Douglas, a political subdivision of the State of Nebraska, et al., appellants and cross-appellees.

___ N.W.2d ___

Filed July 18, 2014.    Nos. S-13-689, S-13-691.

1. **Jurisdiction: Appeal and Error.** The question of jurisdiction is a question of law, which an appellate court resolves independently of the trial court.
2. **Equity: Appeal and Error.** Although in many contexts the traditional distinctions between law and equity have been abolished, whether an action is one in equity or one at law controls in determining an appellate court's scope of review.
3. **Actions: Pleadings.** Whether a particular action is one at law or in equity is determined by the essential character of a cause of action and the remedy or relief it seeks.
4. **Injunction: Equity.** An action for injunction sounds in equity.
5. **Declaratory Judgments.** An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.
6. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.

7. **Evidence: Appeal and Error.** When credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.

8. **Wages: Words and Phrases.** Deferred compensation is defined as compensation which is earned in exchange for services rendered.

9. **Statutes: Words and Phrases.** The word "may" when used in a statute will be given its ordinary, permissive, and discretionary meaning unless it would manifestly defeat the statutory objective.

10. \_\_\_\_: \_\_\_\_. As a general rule, the word "shall" in a statute is considered mandatory and is inconsistent with the idea of discretion.

11. **Equity: Estoppel.** The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.

12. **Political Subdivisions: Equity: Estoppel.** Although the State and its political subdivisions can be equitably estopped, the doctrine of equitable estoppel will not be invoked against a governmental entity except under compelling circumstances where right and justice so demand; in such cases, the doctrine is to be applied with caution and only for the purpose of preventing manifest injustice.

13. **Estoppel.** Equitable estoppel does not create a new right or give a cause of action; rather, it serves to protect rights already acquired.

14. **Contracts: Ratification: Words and Phrases.** Ratification is the acceptance of a previously unauthorized contract.

15. **Ratification: Agents.** Ratification of an agent's unauthorized acts may be made by overt action or inferred from silence and inaction.

16. **Contracts: Counties: Administrative Law.** A county enters into contracts by a majority vote of its board of commissioners.

17. **Principal and Agent: Contracts: Ratification.** A principal may ratify what he could have authorized.

18. **Principal and Agent: Ratification.** Essential to a valid and effective ratification of an unauthorized act is the principal's complete knowledge of the unauthorized act and all matters related to it.

19. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeals from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed in part, and in part reversed and remanded with direction.

Donald W. Kleine, Douglas County Attorney, and Bernard J. Monbouquette for appellant.

Joel Bacon, Gary L. Young, Jefferson Downing, and Thomas P. McCarty, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellees.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Cassel, J.

## INTRODUCTION

For many years, a county's retired employees paid the same amount as active employees paid for health insurance coverage. After the county began to charge retirees a different and greater premium, they sued the county. We must decide whether the retirees had a contractual right to the previous practice and, if not, whether equitable estoppel or ratification affords them relief. We conclude that there was no contract and that the alternative doctrines provide no basis for relief. Thus, we affirm the district court's summary judgment denying the contract claim and reverse the court's decree granting injunctive relief, damages, and attorney fees, on the alternative grounds.

## BACKGROUND

The Douglas County Board of Commissioners (Board) is the governing body of Douglas County, Nebraska (County). Only the Board can enter into contractual agreements on the County's behalf.

### Health Insurance

The Board has the responsibility and authority to determine who participates in the Douglas County health insurance plan (Plan) and the premiums to be paid by participants. Each year, the Board votes on a resolution to set premium rates for the Plan.

In December 1974, the Board passed a resolution which allowed employees of the County who retired between the ages of 55 and 65 to participate in the Plan until attaining age 65. This resolution applied only to employees who were qualified to participate in the County's pension plan. The December 1974 resolution did not specify the amount of premiums to be charged annually or promise that the amount would be the same as that charged to active employees.

Since that time, retired employees have paid the same premiums to participate in the Plan as active employees. Each year when the Board voted on a resolution to set premium rates, the resolution did not draw any distinction between active employees and retired employees; rather, the resolution merely referred to "employees."

### Increased Charges
### to Retirees

In 2008 and 2009, the County was in a fiscal crisis. The County considered numerous alternatives to respond to rising costs in health insurance. One alternative was requiring retired employees to pay a different rate for health insurance than that paid by active employees. Other options included eliminating the "Rule of 75," which is an early retirement option; raising deductibles; raising copayments; establishing a wellness program; and raising premiums for all employees.

In September 2009, the Board voted unanimously to adopt resolution No. 596, which changed the amount retired employees paid toward premiums for the Plan in order to "adequately address the significantly increased health care costs impacting Douglas County's health insurance budget, and the Government and Accounting Standards Board . . . rules relating to the unfunded liability of employer health insurance for retirees." The resolution provided that the change would be effective January 1, 2010.

Resolution No. 596 set a rate for participating retired employees that was higher than the rate paid by active employees. For retired employees who had employee-only coverage, the change meant that they were required to pay 25 percent of the total premium, whereas an active employee had to pay only 7 percent. As a result, in fiscal year 2010, a retired employee's premium was $1,001.04 more per year. For retired employees who had dependents, the change meant they were required to pay 35 percent of the total premium, compared to the 15 percent an active employee was required to pay. Depending upon the number of dependents a retired employee had, the change resulted in the retired

employee's paying $2,040.36 to $2,750.04 more per year than an active employee.

## Litigation

Shortly before the change was to take effect, Sam Christiansen, a retired employee of the County under age 65 who participated in the Plan, filed a complaint against the County and each commissioner of the Board, seeking injunctive and declaratory relief. Later, Rich McShane, also a retired employee of the County under age 65 who participated in the Plan, filed a similar complaint "on behalf of himself and all similarly situated persons." He identified the class as "all retired employees who are participants in the [Plan], who have retired prior to January 1, 2010, and who are not 65 years of age prior to January 1, 2010." We refer to the plaintiffs in these actions collectively as "the retirees."

The retirees sought an order temporarily and permanently enjoining the County and each commissioner of the Board from implementing resolution No. 596 and any change in the manner of assessing health care premiums. They also sought attorney fees as permitted by 42 U.S.C. § 1988(b) (2012), a declaration of the rights of the retirees under the U.S. and Nebraska Constitutions, and any monetary losses suffered.

The district court later consolidated the cases and certified the class. The court stated that commonality was established by the fact that all employees of the County received information regarding premiums to be paid for participation in the Plan postemployment. Thus, the court stated, the claims of all class members would be based on the same legal theory of breach of contract.

## Partial Summary
### Judgment

Upon the County's motion, the district court granted a partial summary judgment. The court determined that health insurance did not qualify as deferred compensation. Accordingly, the court ruled that the County's practice of treating retired employees the same as active employees for purposes of setting health insurance premiums did not create contractual rights

protected by the Contracts Clauses of the U.S. Constitution[1] and the Nebraska Constitution.[2]

The district court denied the motion for summary judgment as to whether applying the doctrines of ratification or estoppel to the County's practice gave rise to a contractual obligation.

### Evidence at Trial

Kathy Goodman, the County's pension and insurance coordinator since 1997, had the obligation to inform employees about their retirement benefits. She understood that employees relied upon this information and that it was important for the information to be accurate. She also understood that the Board had the sole authority to determine the premiums for participation in the Plan each year.

Several commissioners acknowledged that employees were not going to approach the commissioners in order to ascertain the employees' retirement benefits. Similarly, the commissioners did not expect employees to look through old Board resolutions. These commissioners testified that it was reasonable for employees to rely on Goodman and on the documents produced by Goodman and the human resources department.

Each year, after the Board set a rate structure for the Plan, Goodman provided rate sheets to employees during open enrollment. Before adoption of resolution No. 596, the rate sheets did not draw a distinction between retired and active employees; they merely listed the premiums for "employees." The retirees concluded this meant there was no difference between active employees and retired employees with regard to the cost of insurance.

Before an employee retired, Goodman provided the employee with a letter regarding retirement benefits. Before adoption of resolution No. 596, the letter stated that "[a]s an early retiree you will continue to be eligible for our group insurance plans until you become Medicare-eligible at age 65." This language was phrased as a representation about what would happen in the future until an employee turned age

---

[1] U.S. Const. art. I, § 10.

[2] Neb. Const. art. I, § 16.

65. The letter stated that premiums were subject to change with the upcoming year's renewal increases, but it did not state that retired employees would be treated differently than active employees.

In 2000, Goodman began conducting seminars on retirement benefits. She held the seminars at each of the County's departments and offered an open session for all employees. Most employees attended the seminars.

In connection with the seminars, Goodman created and distributed a document entitled "Douglas County Employees' Retirement Trust Fund" (Retirement Handout) to help employees understand their future retirement benefits. The Retirement Handout contained a list of frequently asked questions, including the following concerning health insurance: "Would the medical insurance premium be the same?" and "Upon retirement, are you still considered an employee as far as benefits?" Goodman included the questions because they were asked "about 90 percent of the time from employees." The Retirement Handout contained the following answer in part under the heading "Medical/Dental/Life Benefits as a Retiree":

> You are still considered an employee of Douglas County with regard to the benefit package. As an early retiree, you can continue under the medical, dental and life plan for yourself and your eligible dependents until age sixty-five (65) when you become Medicare eligible. You will have the benefits as an active employee for the premiums, changes, and Open Enrollment.

Goodman obtained approval for the Retirement Handout. According to Goodman, "[a]dministration" and the Douglas County Pension Committee approved it. Goodman believed that she presented a copy of the Retirement Handout to all of the commissioners, because they are the "governing body" and she "would present [to them] anything that is going to come from my office that has any affect [sic] on any of the benefit information."

Goodman continued to make the Retirement Handout available to employees after the seminars. The County also made the Retirement Handout available upon request to all

of its employees until January 1, 2010, when the language was changed. The payroll coordinator at the Douglas County Health Center distributed the Retirement Handout to approximately 400 employees who were eligible for retirement in 2000 and also continued to make it available for employees at the health center who "needed to look at how the insurance was figured."

Three commissioners and the human resources director testified to the effect that the language was phrased as a promise about how employees would be treated in the future, after they retired. The retirees understood the language to mean that after retirement and until age 65, they would pay the same premiums as an active employee. But Goodman testified that she was referring to the present time when making a representation about the share of premiums to be paid by a retiree. The County's chief administrative officer testified that she spoke at two seminars in 2000 and that she told the attendees there was no guarantee that benefits would be provided to them upon retirement. No one asked her whether the premiums would always be the same cost. Her understanding of written representations about the share of premiums to be paid by retired employees was that they spoke to the present time only, because the premiums could change every year and there was nothing in the union contracts or in the pay plan in regard to postemployment benefits.

On approximately November 1, 2007, the Douglas County Pension Committee posted a Web site containing a "Frequently Asked Questions" page. The page included the following question, which dealt with health insurance for retirees: "Would the medical insurance premium be the same?" The answer was: "Current eligible retirees can continue under the Douglas County benefit plan at the same monthly rate as active employees until age 65. Payments are sent directly to the benefit office by the first of each month." This question was included because it was asked 90 percent of the time by employees considering retirement. Prior to being posted, each page of the proposed Web site was reviewed by the pension committee. The pension committee included a commissioner, the chief administrative officer, the human resources director, and the County's fiscal

director. No one objected to the content. The Web site was removed after the Board approved resolution No. 596.

Evidence was adduced regarding oral representations concerning a retired employee's participation in the Plan. During employee orientations at the health center, employees often asked about their ability to participate in the Plan postretirement for the same premiums as active employees, and the payroll coordinators told them they would be able to do so until age 65. One class member testified that before retirement, he began "crunching numbers" to see how feasible it was for him to retire. He specifically asked Goodman about insurance, and he testified that she confirmed he would "get to continue paying for County health insurance as if [he] were still working" until he reached age 65. Several other retirees testified similarly.

Oral representations concerning the premiums to be paid by a retired employee were also made during negotiations of labor contracts. During the 1990's, Christiansen, who was president of one of the labor unions, was involved in negotiations with the County. He testified that the negotiator for the County and the chief administrative officer said that retired employees would be able to continue to participate in the Plan and that the premiums would be the same as that of an active employee. While negotiating, Christiansen met with commissioners and discussed health insurance. He testified:

> They knew that the insurance would be the same, the premium would be the same and that people were going to retire earlier. They also understood that that was going to be an added liability to the County and were concerned, but they certainly were willing to continue with the health benefits.

While health insurance and pensions were discussed during negotiations, the terms were never set forth in the contracts, but "[i]t was assured that those benefits would not change." Gary Kratina, a class member who also served on the union's negotiating team, heard at least two representatives of the County make the same representation.

Testimony was adduced that representations about postretirement participation in the Plan were used to recruit new

employees. McShane was involved in recruiting new employees for the sheriff's department, and based on materials he was provided, he told prospects that upon retirement, they would be able to participate in the Plan, and that retired employees were paying the same rate as active employees. Kratina testified that when he was hired in 1975, a commissioner at that time told him employees "would have insurance, and the insurance would be the same always as the employees up to age 65." Kratina heard multiple sheriffs and captains and the chief deputy sheriff tell new employees, as a "recruiting element," that upon retirement they would be able to participate in the Plan and "would have the same payments as you would as a regular employee." He testified that this was said "over and over" to recruit new employees and was included in "written literature" distributed to recruits.

The retirees viewed the representations as part of the compensation package they were receiving in exchange for the work they were performing. Several retirees testified it was important to them to know that when they retired, they would be treated the same as active employees with regard to health insurance.

Commissioner Mike Boyle, who had been a commissioner since 1997, characterized the Plan as a form of compensation to County employees. He felt that the County had promised its employees that they would be able to participate in the Plan for the same premiums as active employees and that this promise was something that the Board renewed each year when it voted on premiums. He testified that while a commissioner, he had spoken to 25 to 30 active employees and told them that upon retirement, they would be able to participate in the Plan for the same premiums as an active employee. He testified that he had seen the Retirement Handout "for quite a long time, for years, I believe."

Commissioner Kyle Hutchings testified that retired employees were allowed to participate in the Plan as a benefit of employment and not as deferred compensation. He characterized it as a gratuity because he did not feel that the County had a requirement to provide that insurance to retired employees. Hutchings was unaware of communications of any type

that the County made to its employees telling them that upon retirement, they would be able to continue in the Plan at the same monthly premium rates as active employees. Although a member of the pension committee, Hutchings testified that he first became aware of the content of the "Frequently Asked Questions" page on the pension committee Web site sometime after adoption of resolution No. 596.

Commissioner Clare Duda, who had been a commissioner for 20 years, testified that because retired employees are not covered by any union contract, they could participate in the Plan at the pleasure of the Board and at the rates set by the Board. Duda recalled discussions with Christiansen and other members of the union in the late 1990's about the need for health insurance coverage of younger retired employees. Duda testified that the Board wanted to include them in the Plan, but that the Board "would never have represented that it would be at the same rate." Prior to the vote on resolution No. 596, Duda had never visited the pension committee Web site and had not attended any seminars or read any document prepared by Goodman concerning health insurance costs for retired employees. He testified that he first saw the Retirement Handout shortly before trial and that he was confused when he testified in his deposition that he reviewed it annually.

Commissioner Mary Ann Borgeson testified that the Board prepared a budget every year and talked about continuing to provide the health insurance benefit to retired employees. She recalled negotiations with Christiansen and his fellow union members, but denied stating that retired employees would always be able to participate in the Plan at the same cost as active employees.

Commissioner Marc Kraft testified that at the time resolution No. 596 was adopted, he had no knowledge of any representations made by Goodman to County employees about the amount of health insurance premiums they would have to pay in order to participate in the Plan during retirement. He never read any handouts prepared by her that contained anything dealing with health insurance for retired employees, nor did he attend any seminars that she presented. He never read the pension committee Web site. Prior to September 2009, Kraft was

unaware that health insurance was offered to retired employees. Similarly, Commissioner Pam Tusa testified that she "had no understanding" about the ability of retired employees under age 65 to participate in the Plan.

Commissioner Chris Rodgers testified that in 2009, he was aware that retired employees under the age of 65 were allowed to participate in the Plan but was not aware of any representations made by the County's representatives, including Goodman, to employees about the amount of premiums they would pay during retirement. He never attended a seminar in which retirement benefits were discussed and never read documentation of any type that mentioned health insurance for retired employees. He did not read the pension committee Web site while a commissioner.

As of January 1, 2010, there were 250 to 275 retirees participating in the health insurance plan. At that time, between 1,850 and 2,300 active full-time employees were eligible for the benefit. If the County spread costs equally across all participants, the increase in premium costs for the retirees would not have been as significant. Although the retirees knew that insurance costs would increase incrementally every year, the amounts were not "staggering." McShane testified that subjecting the active employees to a substantial increase in premium rates would cause an "uproar." The payroll coordinator testified that "the employees would be raising Cain" if the County had attempted to raise active employees' rates to the same level it raised them for the retirees.

## District Court Order
### and Judgment

On March 8, 2013, the district court entered an order following trial. The court found that equitable estoppel barred the County from denying the existence of a contractual obligation to treat retired employees under age 65 the same as active employees for the purpose of setting health insurance premiums. The court also stated that "[a]lthough there is likely sufficient evidence to find a contractual obligation arose via ratification, the Court will only make the finding that the Board had sufficient knowledge for ratification given all of the evidence

supporting [the retirees'] equitable estoppel claim." Having found the existence of a contractual obligation, the court determined that resolution No. 596 violated the Contracts Clauses of the U.S. and Nebraska Constitutions because it constituted a substantial impairment on the contractual obligation. In finding that the County's actions were not a legitimate exercise of sovereign powers, the court noted that there was no evidence that the disadvantages to the retirees were offset by any new comparable advantages and that other options were available to achieve the same amount of cost savings.

The district court subsequently entered a permanent injunction, enjoining the County from treating the retirees differently than active employees in determining the amount of premiums to be paid for participation in the Plan. It ordered the County to repay over $1 million in premiums. Because the court found liability under 42 U.S.C. § 1983 (2012) for the violation of the Contracts Clauses, it awarded $178,703.94 in attorney fees pursuant to 42 U.S.C. § 1988.

The County timely appealed, and the retirees filed a cross-appeal. Pursuant to statutory authority, we granted the County's petition to bypass the Nebraska Court of Appeals.[3]

### ASSIGNMENTS OF ERROR

The County assigns that the district court erred in (1) exercising jurisdiction even though the retirees failed to comply with the county claims statute, (2) finding sufficient evidence of equitable estoppel to create a binding legal contract concerning the amount of health insurance premiums the retirees would pay after retirement, (3) finding that the Board ratified certain representations by County employees concerning the amount of premiums retirees would pay in order to participate in the Plan after retirement, (4) finding that various representations concerning health insurance premiums created a vested contractual obligation of the County to its retirees, (5) finding that resolution No. 596 violated the Contracts Clauses of the U.S. and Nebraska Constitutions, (6) finding that the resolution impaired the County's obligation to its retirees and was a

---

[3] See Neb. Rev. Stat. § 24-1106(2) (Reissue 2008).

violation of the Contracts Clauses, and (7) finding commonality and certifying a class.

On cross-appeal, the retirees assign that the district court erred in (1) granting summary judgment to the County on the retirees' claim that a contractual obligation arose under *Halpin v. Nebraska State Patrolmen's Retirement System*,[4] (2) failing to find a contract arose under *Halpin*, and (3) failing to rule that a contract arose via ratification.

## STANDARD OF REVIEW

[1] The question of jurisdiction is a question of law, which an appellate court resolves independently of the trial court.[5]

[2-5] Although in many contexts the traditional distinctions between law and equity have been abolished, whether an action is one in equity or one at law controls in determining an appellate court's scope of review.[6] Whether a particular action is one at law or in equity is determined by the essential character of a cause of action and the remedy or relief it seeks.[7] The retirees claimed violations of the Contracts Clauses of the U.S. and Nebraska Constitutions. They sought injunctive relief and declaratory relief, as well as monetary damages incident to such relief. An action for injunction sounds in equity.[8] An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.[9]

[6,7] Although the retirees' actions had elements of both an action in equity and one at law, we conclude that the primary objective was equitable relief, not monetary damages. On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions

---

[4] *Halpin v. Nebraska State Patrolmen's Retirement System*, 211 Neb. 892, 320 N.W.2d 910 (1982).

[5] *In re Estate of McKillip*, 284 Neb. 367, 820 N.W.2d 868 (2012).

[6] *State ex rel. Wagner v. Amwest Surety Ins. Co.*, 274 Neb. 121, 738 N.W.2d 813 (2007).

[7] *Id.*

[8] *Obermiller v. Baasch*, 284 Neb. 542, 823 N.W.2d 162 (2012).

[9] *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013).

of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.[10] But when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.[11]

## ANALYSIS

### Noncompliance With County Claims Statute

We first address the County's jurisdictional argument. The County contends that the district court lacked jurisdiction over this matter because the retirees filed their complaints with the court and not with the county board as required by the county claims statute.[12] The county claims statute provides, in pertinent part, that "[a]ll claims against a county shall be filed with the county clerk within ninety days from the time when any materials or labor, which form the basis of the claims, have been furnished or performed . . . ."[13] The purported contract at issue in this case concerns health insurance benefits. Compliance with § 23-135 was not required. We conclude that the district court properly exercised jurisdiction over the matter.

### Contract Under Halpin

Before addressing the County's other assignments of error, we consider the retirees' claim on cross-appeal that the district court erred in failing to find a contract arose under *Halpin*[14] and in granting summary judgment to the County on that claim. The retirees argue that postretirement health insurance is a form of deferred benefit subject to *Halpin* and that the County's long practice of providing the retirees with

---

[10] See *United States Cold Storage v. City of La Vista*, 285 Neb. 579, 831 N.W.2d 23 (2013).

[11] See *id*.

[12] See Neb. Rev. Stat. § 23-135 (Reissue 2012).

[13] § 23-135(1).

[14] *Halpin, supra* note 4.

health insurance benefits gave rise to a contractual obligation. The retirees assert that under *Halpin*, when an employee relies upon an administrative pattern and practice regarding a deferred benefit to the employee's detriment and to the benefit of the employer, the employee has expectations protected by contract law.

*Halpin* involved a case decided under the Contracts Clause of the U.S. Constitution. For 10 years, the computation of a retiring patrolman's final average monthly salary included a lump-sum payment received for accumulated but unused vacation and sick leave. Effective January 4, 1979, that lump-sum payment was excluded. A retired member of the patrol brought a class action suit seeking a declaratory judgment that the final average monthly salary of a retiring patrolman should include the lump-sum payment. The trial court determined that the lump-sum payment should not be included in the final average monthly salary because the administrative policy of including such payments did not create contractual rights. On appeal, we reversed. We recognized that employee pensions were not gratuities, but, rather, were deferred compensation for services rendered. We stated that employees' rights with regard to their pensions were contractual in nature. Thus, we found that the change in calculating pension annuities resulted in an unconstitutional impairment of the retiring members' contractual rights.

[8] More recently, we considered whether an employee had a contractual right to a long-term disability policy for purposes of the Contracts Clause. In *Livingston v. Metropolitan Util. Dist.*,[15] a disabled employee relied upon *Halpin* in arguing that his contractual rights were interfered with when the portion of long-term disability coverage that provided for lifetime benefits was eliminated. We considered whether the long-term disability policy was akin to a pension or deferred compensation such that the disabled employee had a contractual right for purposes of the Contracts Clause. We reasoned that it did not meet the definition of deferred compensation, i.e., it was

---

[15] *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005).

not "compensation which is earned in exchange for services rendered."[16] We noted that enrollment in the plan was purely voluntary and that the accrual of coverage depended upon the payment of premiums and the occurrence of an injury rather than on the rendering of services. And because the policy was not a pension or deferred compensation, we concluded that the employee had no contractual right in the policy for purposes of the Contracts Clause.

In *Livingston*, we disapproved an earlier case to the extent that it was inconsistent. We stated that *Omer v. Tagg*[17] "appears to hold, with little analysis, that health insurance is akin to deferred compensation."[18] In *Omer*, a retired patrolman sued after being told that he was ineligible to participate in the State's group insurance program. When hired, the patrolman was told by the superintendent of the patrol or one of his designees that upon retirement, the patrolman would be allowed to continue to participate in the group health insurance upon payment of the premium. We stated in *Omer* that the State's position that benefits were a gratuity was rejected in *Halpin* and that "promises made at the time of employment were for compensation to be enjoyed at retirement and constituted a contract enforceable against the State."[19] Because this reasoning, as it pertains to health insurance, was inconsistent with our opinion in *Livingston*, it was disapproved.

We adhere to the reasoning expressed in *Livingston*. The Plan in the instant case is not a pension or deferred compensation. An employee's participation in the Plan was purely voluntary, and obtaining coverage under the Plan was not contingent upon the rendering of services, but, rather, required the payment of premiums.

[9,10] Nebraska statutes differentiate between plans for health insurance for county employees and plans for retirement. A statute concerning employee benefit plans for a political

---

[16] *Id*. at 307, 692 N.W.2d at 480.

[17] *Omer v. Tagg*, 235 Neb. 527, 455 N.W.2d 815 (1990).

[18] *Livingston, supra* note 15, 269 Neb. at 308, 692 N.W.2d at 481.

[19] See *Omer, supra* note 17, 235 Neb. at 530, 455 N.W.2d at 817.

subdivision, such as a county, requires only that the political subdivision "may" establish benefit plans for its employees which will provide medical coverage.[20] The word "may" when used in a statute will be given its ordinary, permissive, and discretionary meaning unless it would manifestly defeat the statutory objective.[21] On the other hand, a county's retirement system "shall be composed of all persons who are or were employed by member counties and who maintain an account balance with the retirement system,"[22] and "[a]ll permanent full-time employees shall begin participation in the retirement system upon employment . . . ."[23] As a general rule, the word "shall" in a statute is considered mandatory and is inconsistent with the idea of discretion.[24] Members of the retirement system are vested after 3 years of participation.[25] There is no similar statutory vesting in a health insurance plan.

Because the Plan is not a pension or deferred compensation, the retirees had no contractual right to participate in the Plan for the same premiums paid by active employees. As we concluded in *Livingston*, no analysis under the Contracts Clause is necessary. The district court did not err in determining that the County's practice of allowing retirees to participate in the Plan for the same premiums as active employees did not create contractual rights protected by the Contracts Clause and in granting summary judgment to the County on that claim.

### Equitable Estoppel

We next consider whether the district court erred in finding that equitable estoppel prohibited the County from increasing the premiums to be paid by the retirees above those paid by active employees. The County argues that equitable estoppel

[20] See Neb. Rev. Stat. § 13-1614 (Reissue 2012).

[21] *Conley v. Brazer*, 278 Neb. 508, 772 N.W.2d 545 (2009).

[22] See Neb. Rev. Stat. § 23-2306(1) (Supp. 2013).

[23] § 23-2306(2)(a).

[24] *Burns v. Nielsen*, 273 Neb. 724, 732 N.W.2d 640 (2007).

[25] See Neb. Rev. Stat. § 23-2319(3) (Supp. 2013).

cannot apply to create a contractual obligation to treat the retirees the same as regular active employees. We agree.

[11,12] The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.[26] Although the State and its political subdivisions can be equitably estopped, the doctrine of equitable estoppel will not be invoked against a governmental entity except under compelling circumstances where right and justice so demand; in such cases, the doctrine is to be applied with caution and only for the purpose of preventing manifest injustice.[27]

[13] Equitable estoppel cannot create a contractual obligation where one does not otherwise exist. We have already concluded that the retirees had no contractual right to participate in the Plan at the same premiums as active employees. Here, the district court used estoppel to create a vested obligation on the part of the County. Equitable estoppel does not create a new right or give a cause of action; rather, it serves to protect rights already acquired.[28] It may be urged for protection of a right, but it can never create a right.[29]

Because the retirees had no contractual right to pay the same premiums as active employees, we conclude that the district court erred in using estoppel to create such a contractual obligation. Accordingly, we reverse the district court's judgment finding a contractual obligation based upon equitable estoppel.

### RATIFICATION

[14,15] We next consider whether a contractual obligation arose via ratification. Ratification is the acceptance of a

---

[26] *Burns, supra* note 24.

[27] See *Berrington Corp. v. State*, 277 Neb. 765, 765 N.W.2d 448 (2009).

[28] *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

[29] See *id.*

previously unauthorized contract.[30] Ratification of an agent's unauthorized acts may be made by overt action or inferred from silence and inaction.[31]

Both parties fault the district court's determination regarding ratification. The court found that the Board had sufficient knowledge to ratify the representations made, but the court declined to specifically find a contractual obligation through ratification. The retirees argue that the court erred in failing to expressly rule that a contractual obligation arose through ratification. The County, on the other hand, argues that the court erred in concluding that the Board ratified previous representations concerning premiums to be paid by retirees.

[16,17] A county enters into contracts by a majority vote of its board of commissioners.[32] For purposes of this opinion, we assume, without deciding, that the County had the power to contract for health insurance for the retirees. A principal may ratify what he could have authorized.[33] Here, ratification of a contractual obligation could only occur by the act of a majority of the commissioners.

[18] But ratification by a majority of the Board is not supported by the evidence. Essential to a valid and effective ratification of an unauthorized act is the principal's complete knowledge of the unauthorized act and all matters related to it.[34] Thus, in order for there to have been a ratification of the representations concerning the premiums to be paid by retired employees participating in the Plan, a majority of the commissioners would have needed to know of them. But only one commissioner testified that he was aware of representations that retired employees would be treated as active employees for purposes of health insurance until age 65. A majority of the commissioners had not read the Retirement Handout and,

---

[30] *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013).

[31] *Id.*

[32] See Neb. Rev. Stat. §§ 23-103 and 23-104(6) (Reissue 2012).

[33] *Millett v. Miller*, 135 Neb. 123, 280 N.W. 442 (1938).

[34] *Western Fertilizer v. BRG*, 228 Neb. 776, 424 N.W.2d 588 (1988).

thus, did not know of the representation contained therein. In a recent case involving a limited partnership, we stated that even if a majority of the limited partners had ratified the acts, there could be no ratification where the partnership agreements required consent of all of the limited partners.[35] Similarly, the Board could not create a contractual obligation through ratification when a majority of the commissioners did not even know of the representations.

The district court imputed knowledge to the commissioners. The court recognized that four commissioners testified they had not read Goodman's handouts or attended the retirement seminars, but the court stated that such inaction did not insulate the commissioners from knowledge. The court relied on *Baxter v. National Mtg. Loan Co.*,[36] where we stated:

> "[T]he principal cannot be justified in wilfully closing his eyes to knowledge. He cannot remain ignorant where he can do so only through intentional obtuseness. He cannot refuse to follow leads, where his failure to do so can only be explained upon the theory that he preferred not to know what an investigation would have disclosed. He cannot shut his eyes where he knows that irregularities have occurred. In such a case, he will either be charged with knowledge, or with a voluntary ratification with all the knowledge which he cared to have."

We decline to impute knowledge of the representations to the commissioners under the facts of this case. Evidence established that the commissioners receive many documents to review and that it is up to each commissioner to decide what to read in performing his or her duties. While information was available to them that employees were being informed they would pay the same premiums as active employees to participate in the Plan postemployment, there was no evidence that the commissioners knew irregularities were occurring or that they intentionally chose not to learn of the representations. Because the commissioners had no actual knowledge of these

---

[35] See *Brook Valley Ltd. Part., supra* note 30.

[36] *Baxter v. National Mtg. Loan Co.*, 128 Neb. 537, 558-59, 259 N.W. 630, 640 (1935).

representations before they passed the resolution at issue, the district court erred in finding that the Board had sufficient knowledge to ratify the representations. We conclude that no contractual obligation arose via ratification. Although the court imputed knowledge to the Board, it appears to have declined to grant relief on the basis of ratification. Understanding the court's order to deny relief on that ground, we affirm its judgment on that issue.

REMAINING ASSIGNMENTS
OF ERROR

[19] We have determined that the retirees did not have a contractual right in the Plan for purposes of the Contracts Clauses and that no contractual obligations arose under the theories of equitable estoppel or ratification. Because the district court's judgment must be reversed, we do not consider the County's other assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[37]

CONCLUSION

We conclude that the district court properly rejected the retirees' claim that a contractual obligation arose under *Halpin* and that the court did not err in declining to grant relief on the basis of ratification. We reverse the court's determination that equitable estoppel created a contractual obligation, and we remand the cause with direction to enter judgment for the County on the retirees' claims.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.

---

[37] *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014).